UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ARCHBOLD-MANNER, et al.,<br>Jesus Antonio Murillo-Lenis (2)<br>Ranfer Rios-Mercado (3),<br>Carlos Delgado-Gomez (10)<br>Enrique Oyola-Ropero (12),<br>German Villegas-Mejia (17),<br>Gerardo Tobon-Rojas (18) and<br>Fernando Zapata-Bermudez (19)<br><br>Defendants. | Criminal No. 05-342 (RCL) |

**DEFENDANTS' SUPPLEMENTAL BRIEF ON THE ISSUE OF BAD FAITH
IN SUPPORT OF MOTION TO DISMISS FOR LACK OF DUE PROCESS**

NOW COME Defendants Jesus Antonio Murillo-Lenis, Ranfer Rios-Mercado, Carlos Delgado-Gomez, Enrique Oyola-Ropero, German Villegas-Mejia, Gerardo Tobon-Rojas, and Fernando Zapata-Bermudez, by and through undersigned counsel, and file this supplemental brief in support of their Joint Motion to Dismiss Indictment on Due Process Grounds [190].

In an exchange with counsel at the September 12, 2008, Status Conference, the Court offered the view that the "normal" sanction for discovery problems, absent bad faith, is a continuance. The Court also indicated, however, that when defendants have been in custody for an extended period of time, it may well be true that the "normal" remedy is not adequate. The defendants submit this supplemental brief to provide additional legal analysis on this point, and to explain why dismissal is appropriate here.

1

## **OVERVIEW**

As noted at the Status Conference, the defendants remain in the dark about much of the evidence in this case – including the truly basic, Question #1 - whether any controlled substances even exist for the drug crimes with which they have been charged. In its August 15, 2008 Order, this Court stated that any physical evidence not produced by September 8, 2008, would be excluded from trial. Yet no drugs at all have yet been produced on any Count. The Government has indicated that a single "sample" from the 2,500 kilograms of cocaine supposedly seized aboard the M/V Dan Viking still exists; it offered to provide this sample in *Miami only* before the deadline, and it now says it will plan to bring this sample into this jurisdiction for defense inspection "soon" – at a date and time still unknown. As for the rest of the alleged cocaine, all of which supposedly was analyzed by chemists in Colombia, we know absolutely nothing about its present whereabouts. At the Status Conference, the defendants reiterated their requests to inspect and test these drugs, as they have long requested in various motions.[1] Less than 20 days before the October 1 trial date, the prosecutor was forced to concede that he still has no idea whether any of these controlled substances, or any samples thereof, even exist.

The response was particularly remarkable in light of certain comments made at the close of the previous Status Conference in August – when this Court had indicated that if no cocaine started showing up soon, some defendants in this case would start getting sent back to Colombia.

---

[1] *See., e.g.,* Joint Motion to Order Mandated Missing Discovery [187], at 4 (Nos. 11, 14 & 15) & at 7 (Nos. 9, 11 & 12) (requesting "Information about the circumstances of the various seizures," "Documentation about what chemical analyses were performed on the 'bricks,'" and *"Information about when the defendants will be given access for examination of the brick packaging and all things seized"*). *See also id.* at 9 (specifically demanding an "[o]pportunity to view all drugs and packaging for all six counts").

2

## ARGUMENT AND CITATIONS OF AUTHORITY

### A. Failure to Preserve and Produce Material Evidence

The standards for sanctions in a situation like this, involving non-preservation of crucial evidence, were first discussed by the D.C. Circuit in the case of <u>United States v. Bryant</u>, 439 F.2d 642 (D.C. Cir. 1971). There, the D.C. Circuit addressed a situation in which the defendants had been convicted of the sale of a substantial quantity of heroin, and a key undercover tape had been lost. The Court addressed this issue in some detail, and noted how the distinction between good and bad faith is often not so much a bright line, but a continuum:

> It is important to recognize that this is not a case of a good faith effort to preserve highly relevant evidence, frustrated only by an inadvertent loss. Rather, it is a case of intentional non-preservation by an investigative official. On a spectrum between good faith but inadvertent loss and bad faith destruction, Agent Warden's conduct must lie somewhere in the middle. Perhaps it should lie somewhat closer to the latter end. For, despite the overriding vagueness of Agent Warden's testimony, there is at the very least a hint of bad faith in the record. A highly disturbing element of the agent's conduct is his apparent reluctance to let even the United States Attorney's office know that a tape recording had ever been made.

The situation in <u>Bryant</u> may be analogized to the present case, where the Department of Justice Trial Attorney still does not know if this cocaine still exists. The <u>Bryant</u> court acknowledged that it could not say whether the missing evidence would help or hurt the defendant – it might have "corroborated Agent Pope's story perfectly; or, for all we know, it might have completely undercut the Government's case." Because the issue was one of first impression, the <u>Bryant</u> Court remanded the case for further factual development. But the Court was also determined not to let a situation like that arise again, because of a need "to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the Government." While recognizing the truism

3

that "[what] the Government does not have it cannot disclose," the Court described "this line of reasoning [a]s far too facile, and clearly self-defeating." For vital evidence in the hands of the Government, the D.C. Circuit imposed a duty of disclosure, to attach even before a defendant hears of its existence, and said that at the initial point when the Government first gathers such evidence, this "duty of disclosure is operative as a duty of preservation."

The *Bryant* court acknowledged that an exception would still exist for "good faith" loss of evidence. But *Bryant* also noted that this "exception for good faith loss of important evidence must not be allowed to swallow the discovery rules."

> [W]e hold that sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to make this showing. Negligent failure to comply with the required procedures will provide no excuse.

The Court then established a rule over cases prosecuted in this district: "[W]e require rigorous procedures to govern preservation of such evidence by federal investigative agencies, including the District of Columbia police, in the future." If the Government ever wanted forgiveness for lost evidence, it would have a heavy burden to meet – and one that would not turn on a criminal defendant's proof of bad faith. *See, e.g., id.* ("the regular procedures for preservation must be adequate to the task"); *id.* ("[I]n the future, decisions on the question of sanctions in cases such as these will be guided by the preservation requirement announced above, and negligence will be no excuse.").

In *Arizona v. Youngblood*, 488 U.S. 51 (1989), the Supreme Court took up this same issue and did not adopt *Bryant*'s view that the burden in this context should be placed on the Government, regardless of bad faith. The Supreme Court held that Arizona and other courts

4

would not deny due process to a criminal defendant "unless a criminal defendant can show bad faith on the part of the police" in causing the evidence to be destroyed. Even under this newly-established "bad faith" constitutional standard enunciated by the Court, however, many questions remained, as Justice Blackmun, speaking for the dissenters, cogently noted:

> I also doubt that the "bad faith" standard creates the bright-line rule sought by the majority.... [T]he line between "good faith" and "bad faith" is anything but bright, and the majority's formulation may well create more questions than it answers. What constitutes bad faith for these purposes? Does a defendant have to show actual malice, or would recklessness, or the deliberate failure to establish standards for maintaining and preserving evidence, be sufficient? Does "good faith police work" require a certain minimum of diligence, or will a lazy officer, who does not walk the few extra steps to the evidence refrigerator, be considered to be acting in good faith? ... [T]he majority leaves these questions for another day....

In _United States v. McKie_, 951 F.2d 399 (D.C. Cir. 1991), the D.C. Circuit stated that, after _Youngblood_, any continuing viability of _Bryant_ was limited, and said that, in this context, "it is clear that due process claims ... are now governed by the standards enunciated in _Arizona v. Youngblood_." Accord _In re Sealed Case_, 99 F.3d 1175 (D.C. Cir. 1996) (no plain error to deny defendant's due process claim).

The situation in _McKie_, where a conviction was upheld despite a due process challenge, does have some factual similarities to the instant case – since the defendant was charged with a crack cocaine offense, and the crack itself was lost. But _McKie_ also contained substantial differences. The defendant himself admitted in trial testimony that he had possessed crack cocaine, disputing only the amount. And more importantly, the drugs had been lost only after the defendant had been able to review them. _See id._ ("the drugs were apparently available before trial for McKie's independent testing"). Accordingly, the D.C. Circuit deferred to the district court's findings that no bad faith had been established. Even while affirming, however, the

5

Court acknowledged that it was "somewhat uncomfortable with the rather cursory treatment of the missing evidence problem by the government and the district court." It criticized how the district court had largely "based its finding of no bad faith on quite meager assurances from the prosecutor, who ... seemed relatively unconcerned about the loss." While the D.C. Circuit was unwilling to find an abuse of discretion "in light of all the circumstances," it clearly suggested that a more extensive investigation of the loss of evidence, conducted by the lower court, may have been appropriate.

In the instant case, the prosecutors have appeared similarly unconcerned about whether any remaining cocaine still exists that can be tested by the defense. And more importantly, the Government's actions implicate other due process concerns noted in *Youngblood*. For while the Supreme Court in *Youngblood* rejected a due process challenge, it also noted how "there is no showing that the Government intentionally delayed [production of discovery] to gain some tactical advantage over appellees or to harass them." 488 U.S. 51 (citing and distinguishing *United States v. Marion*, 404 U.S. 307 (1971); *United States v. Lovasco*, 431 U.S. 783 (1977)). In the instant case, by contrast, the Government's delays have in fact caused that effect.[2]

### B. Broader Examples of Bad Faith Discovery Delays That Prejudice the Defendants

Not only has the Government failed to establish that it preserved and produced controlled substances applicable to this case, but also, after months and indeed years of inaction on discovery, a huge mass of documents in Spanish has suddenly just been given to the defendants – without any need for anyone to wait for formal answers to the Government's Vienna Convention

---

[2] Of course, this Court need not find any willful misconduct on the part of the Department of Justice lawyers assigned to this case in order to grant a dismissal. As the Supreme Court plainly stated in *Youngblood* itself, the standard is whether "a criminal defendant can show bad faith *on the part of the police*." (emphasis added).

6

Requests that it previously said had been sent to Colombian officials.[3] The Government's excuses for delays in the production of discovery, and in particular its suggestions that it could not produce the requested discovery until it received formal responses to Vienna Convention Requests, now appear to have been misleading. And less than 20 days before trial, some 90-95% of the case discovery is now entirely new, and there is no way these defendants can possibly translate and review with their clients the more than 10,000 pages of additional information in time for effective use at trial – meaning that these late disclosures have provided the Government with a substantial tactical advantage.

The Government tries to avoid sanctions for its late disclosures by suggesting that it will not offer any of these new documents into evidence itself. But the Government cannot say that this vast new library of Spanish documents contains no evidence material to the defense. Logic and odds alone suggest that these 10,000+ pages are surely likely to contain certain exculpatory and impeachment materials that will affect at least some of these defendants. *See* Giglio v. United States, 405 U.S. 150, 154 (1972) ("when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [Brady]'s general rule"). *See also* Brady v. Maryland, 373 U.S. 83 (1963) (Brady evidence must be disclosed *in time for effective use at trial*).

Notwithstanding repeated document requests and Status Conferences held by this Court, at which apologies and promises were made by the Government, this is where we currently are:

---

[3] *See, e.g.,* Government's Omnibus Response to Defendants' Pretrial Motions [216], at 18-19 (claiming that all Colombian seizures were in the possession of the Colombian government, and that the U.S. Government is "under no obligation to produce what it does not possess," but that the U.S. Government had "issued a Vienna Convention Request to the Colombian government requesting evidence relating to these seizures"). *See also id.* at 37 (The DEA's involvement with Colombian law enforcement authorities in the investigation, operation of the wiretaps, searches and seizures were minimal, at best. The DEA does not have operational, supervisory or managerial control over the investigation in this case.... At no time did DEA actively participate in the investigation."). These excuses for delays in the production of discovery, and in particular its suggestions that it could not produce the requested discovery until it received formal responses to Vienna Convention Requests, now appear to have been misleading.

the Government asks this Court to proceed on October 1 with a second-class trial, in which the defendants will be completely unable to digest the vast array of un-translated materials it has just received to see if any of it might help them at trial. Or, the Government says that the Court can grant a continuance of this long-scheduled trial date. Neither is an acceptable solution.

The Government is clearly angling for a continuance in an effort to fend off a dismissal, even telling this Court at the Status Conference that it now believes it can try this case in just 3 weeks. In candor, the defense does not understand how the Government truly plans to introduce its estimated 4-20 wiretapped calls per Count, each of which would need to be authenticated and translated, plus seven Government experts, numerous anticipated cooperating witnesses, various agents from Colombia, and physical evidence, in the time frame now suggested. But even if that is possible, the fact remains that a continuance will force these defendants, all of whom are now presumed innocent, to remain in custody for an additional lengthy period, through no fault of their own.[4] The *only* reason they cannot proceed to trial on October 1, fully prepared, is that the Government has repeatedly failed to produce long-requested discovery in a timely manner.

It is not enough at this stage for the prosecutor to simply stand up at a Status Conference and declare that the United States has acted in good faith in this case. Indeed, if anything, it is telling that the prosecution has found it necessary to do so repeatedly.

The fact that the government is unable to offer any explanation for the extraordinary two-year delay in producing the bulk of its discovery speaks volumes about the motivations of the Government and its law enforcement officials controlling the production of the discovery and evidence. The Court has heard from defense counsel in this case about the discovery problems

---

[4] Bail does not appear to be a realistic alternative for these defendants. Even if granted bail by this Court, the INS would almost certainly take them into immigration custody (and perhaps even house them outside of this jurisdiction, prejudicing their trial preparations). And unlike the typical case, where such immigration holds might be something they deserve as illegal aliens, these holds would be entirely unjust. These defendants are in the U.S. only because the U.S. Government brought them here involuntarily, following their Colombian extraditions.

and late disclosures in other Colombian cases in this court, and the problems caused for those defendants at trial because of late disclosures of evidence and discovery. The Court has also heard that it is clear that the prosecutions in this case are the result of a joint venture agreement between the United States and the Colombian governments. In addition, the Court heard at the recent Status Conference that recent productions show that the United States law enforcement officials and Colombian law enforcement officials in fact have been working together and sharing information and files regarding the investigations, contrary to the Government's previous representations. Finally, the Court has been informed that United States officials have been given access to the relevant files so they could be copied and provided to the defendants in this case in order to avoid dismissal. The only logical conclusion that can be drawn from these facts is that the Colombian and United States law enforcement officials with access to the files in Colombia have decided that they can gain an important tactical advantage over the defendants by simply withholding or delaying production of the discovery and evidence.[5]

Clearly, such a tactic has made it far more difficult to evaluate the evidence and prepare to defend against the allegations. Since the Colombian government and law enforcement officials have otherwise been working closely with the DEA and other United States law enforcement officials in investigating and prosecuting these cases, it makes sense that they can work together to copy and produce the relevant discovery and evidence in a timely manner, unless there is some reason not to cooperate in that endeavor. The Government has offered no explanation why this could not have been done earlier – in spite of the fact that it had to anticipate that the Court would ask that question. Defense counsel submits that there can only be

---

[5] Prior the this Court's August 15, 2008 Order, it does not appear that any other district court judge ever threatened the Government with dismissal for its discovery failures, apparently accepting at face value the Government's representations that formal diplomatic responses from the Colombian government were necessary before such information could be obtained and disclosed by the U.S. Government.

9

one reason – they have seen it work to their advantage in the prior cases and know that the continuing practice will help them gain a tactical advantage over these defendants as well, particularly since no court to date has called them on it. Thus it is important that this Court follow up on its suggestion that it would sanction the government if it did not comply with the Court's Order, including the possibility of dismissal and sending the defendants back to Colombia. See *United States v. Marion*, 404 U.S. 307 (1971); *United States v. Lovasco*, 431 U.S. 783 (1977)).

In short, in the similar joint venture cases being brought in this court, the Colombian and United States governments had become accustomed to being able to withhold evidence, often until the last minute, with the explanation that these are complex international cases in which international protocols have to be followed. However, this Court's recent Order has shown that those explanations were simply an excuse of convenience, rather than the insurmountable obstacle portrayed. Following this Court's recent Order, the two governments were able to cut through the alleged "red tape" and produce the discovery in less than three weeks. The obvious reason: there was no need for the two governments to follow the international protocols. This was a joint venture, and the failures to produce discovery were intentional – at least on the part of the Colombians and DEA agents in control of the evidence and discovery files in Colombia.

Surely the discovery delays in this case are not what one would ordinarily characterize as **good** faith. Cf. *Food Lion, Inc. v. United Food and Commercial Workers International Union, AFL-CIO-CLC*, 103 F.3d 1007 (D.C. Cir. 1996) ("In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order"). Bad faith sufficient to warrant dismissal can be established not only by intentional misconduct, but also by a callous disregard of duties, as the Supreme Court noted in

*National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976). There, in a civil context, the Supreme Court reversed a Third Circuit ruling that had vacated a district court's dismissal of a complaint based on discovery violations. The Supreme Court noted how conduct of the plaintiffs had demonstrated a "callous disregard of responsibilities counsel owe to the Court and to their opponents," practices which it said "exemplify flagrant bad faith." In that case – as here – "[n]ot only did respondents fail to file their responses on time, but the responses which they ultimately did file were ... grossly inadequate."

The Supreme Court in *Metropolitan Hockey Club* noted how it might seem natural for a reviewing court to assume that a sanction of dismissal by a district court was too severe, and to wonder if a party who had received such an order from a district court might already "feel duly chastened" enough to be relieved of the sanction on appeal. But the Court cautioned appellate courts to consider the larger context of sanctions before reversing district courts:

> [H]ere, as in other areas of the law, the most severe in the spectrum of sanctions must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent. If the decision of the Court of Appeals remained undisturbed in this case, it might well be that these respondents would faithfully comply with all future discovery orders entered by the District Court in this case. But other parties to other lawsuits would feel freer ... to flout other discovery orders of other district courts.

In the instant case, similar callous disregard by the Government of its discovery obligations is revealed in the Government's own recent description of events. The Government has now admitted that it took a defendant going outside of this courthouse after the last hearing – in essence, sticking his tongue out at the authorities – in order to motivate those authorities to do what their jobs have required all along. While the Government claims this incident succeeded in finally lighting a fire under them in the instant case, that fire should have been burning all along,

11

and should already have been flickering more after this Court's earlier comments suggesting growing frustrations in previous Status Conferences. Moreover, this Court should consider the larger issue of whether these agents might "flout other discovery orders of other district courts," where no defendant has spoken to the press. A mere continuance would send exactly the wrong message to these agents. They would learn that the only real sanction for their wrongful conduct in this case *has been that the defendants will have to sit in jail awaiting their trials longer.*

This jurisdiction has recently seen an increase in international trafficking cases involving defendants extradited from Colombia. It is no great secret that, in many of those cases, pretrial discovery has been exceedingly sparse. While this case is undeniably an aberration even from those other cases, the norm itself for pretrial discovery in these types of cases in this district has been neither ordinary nor satisfactory. Too often, defendants have heard the same refrain we have heard in this case – about difficulties in obtaining cooperation from the Colombian government and delays in obtaining the necessary diplomatic responses that might allow that evidence to start flowing, even as the cases proceeded closer and closer to trial.

The time has come, particularly based on the record in this case, for this Court to make clear that the traditional criminal pretrial discovery obligations for prosecutions in this U.S. District Court must be respected and honored, even in cases involving Colombian extraditions. These defendants cannot get a fair trial on October 1, and a continuance of that trial date when many of them have already been incarcerated for years, due to discovery problems that were clearly not their fault, would be fundamentally unjust. Dismissal of this indictment is warranted.

>      /s/
> Gregory S. Smith, Bar No. 472802
> 913 East Capitol Street, S.E.
> Washington, D.C. 20003
> (202) 460-3381
> On behalf of Carlos Delgado-Gomez (#10)

                  /s/
Anthony Martin, Bar No. 362537
On behalf of Jesus Antonio Murillo-Lenis (#2)

                  /s/
Diane S. Lepley, Bar No. 368927
On Behalf of Ranfer Rios-Mercado (#3)

                  /s/
Ron Earnest, Bar No. 477305
On behalf of Enrique Oyola Ropero (#12)

                  /s/
Cynthia Katkish, Bar No. 418876
On behalf of German Villegas-Mejia (#17)

                  /s/
Mitchell Seltzer, Bar No. 261933
On behalf of Fernando Zapata-Bermudez(#18)

                  /s/
Howard B. Katzoff, Bar No. 348292
Counsel for Gerardo Tobon-Rojas (#19)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANTS' SUPPLEMENTAL BRIEF ON THE ISSUE OF BAD FAITH IN SUPPORT OF MOTION TO DISMISS FOR LACK OF DUE PROCESS is being served upon counsel for the United States and all co-defendants' counsel through the Electronic Case Filing system.

This 15th day of Septemer, 2008.

                  /s/
Gregory S. Smith